Case 4:21-cr-00062   Document 1   Filed on 02/23/21 in TXSD   Page 1 of 12

United States Courts
Southern District of Texas
FILED
*February 23, 2021*
Nathan Ochsner, Clerk of Court

Sealed
Public and unofficial staff access to this instrument are prohibited by court order

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| v. § | Criminal No. **4:21-cr-62** |
| § | UNDER SEAL |
| FARRAH FOROUGH FARIZANI, D.O., § | |
| HAMID REZA RAZAVI, § | |
| ELIE HANNA HAJJAR, and § | |
| JUAN ACUÑA, § | |
| § | |
| Defendants. § | |

## INDICTMENT

The Grand Jury charges:

### General Allegations

At all times material to this Indictment, unless otherwise specified:

### The Medicaid Program

1. The Medicaid Program ("Medicaid") was a state-administered health insurance program funded by the United States Government and by the State of Texas. Medicaid helped pay for reasonable and necessary medical procedures and services provided by qualified healthcare professionals to individuals who were deemed eligible under state low-income programs. Medicaid was implemented in 1967 under the provisions of Title 19 of the Social Security Act of 1965. Individuals receiving benefits under Medicaid were referred to as Medicaid "clients." The Texas Health and Human Services Commission ("HHSC") administered Medicaid in Texas.

2. Medicaid was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3. The State of Texas contracted with Texas Medicaid and Healthcare Partnership

("TMHP") to administer Texas Medicaid on behalf of Texas HHSC.

4. Texas HHSC contracted with Managed Care Organizations ("MCOs") to administer health insurance plans to Medicaid clients.

5. In order to receive reimbursement from Medicaid, a provider applied to TMHP to become an approved Medicaid provider. If the provider met certain minimum qualifications, TMHP approved the application, entered into a written contract with the provider, and issued the provider a unique identification number also known as a "provider number." TMHP-enrolled providers could contract with MCOs to provide medical services to Medicaid clients. The provider was then allowed to submit bills for services, known as "claims," to TMHP or MCOs for reimbursement for the cost of providing medically necessary services to Medicaid clients.

6. An entity consisting of one or more healthcare professionals could apply to TMHP to enroll as a Medicaid group provider. Physicians, physician's assistants, and advanced practice registered nurses were required to enroll with TMHP in order to submit claims to Medicaid for services provided under the group. If additions or changes occurred in a group's enrollment information (for example, a performing provider left or entered the group, changed an address, or a provider was no longer licensed) after the enrollment process was completed, the provider group was required to notify Medicaid of the changes in writing within 10 calendar days.

7. Upon assignment of a Medicaid provider number, a current Texas Medicaid Provider Procedures Manual was distributed to the provider. Updates to the procedures manual were included in Texas Medicaid Bulletins, which were distributed to the provider by TMHP and available online. The procedures manual, bulletins, and updates detailed the rules and regulations pertaining to services covered by Medicaid and how to appropriately bill for services provided to clients.

8. The American Medical Association's Current Procedural Terminology ("CPT") codes were uniform, five-digit codes that were used to report medical procedures and services to health insurance entities, including Medicaid and MCOs. In the context of billing Medicaid, CPT codes described the kind of procedure(s) a client received from a provider.

9. A Medicaid claim was required to set forth, among other things, the client's name and Medicaid identification number, the services performed for the client, the date the services were provided, the cost of the services, and the name and identification number of the physician or other healthcare provider who rendered the services. Upon submitting a claim to Medicaid, a provider certified, among other things, that:

    a. The information submitted regarding claims or encounter data was true, accurate, and complete; and

    b. The claim or encounter data submitted was prepared in compliance with the laws and regulations governing Medicaid.

10. Pursuant to Texas Occupations Code, § 157.001(a)(2), a physician could not delegate medical acts to a person who represented to the public that he or she was authorized to practice medicine.

11. Medicaid required the provider to maintain all necessary records that fully and accurately document the services provided to a Medicaid client, identify who rendered the services, support the medical necessity of those services, and determine whether payment for those items or services was due and was properly made.

## The Medicare Program

12. The Medicare Program ("Medicare") was a federally funded healthcare program providing health care benefits to certain individuals who were 65 years or older or disabled. The

benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

13. Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

14. Medicare was divided into different parts. Medicare Part B paid for certain physician services, outpatient services, and other services.

15. Physicians, clinics, and other healthcare providers that provided services to Medicare beneficiaries, were able to apply for an obtain a Medicare "provider number." A healthcare provider that was issued a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

16. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare identification number, the services performed for the beneficiary, the date the services were provided, the cost of the services, and the name and identification number of the physician or other healthcare provider who rendered the services. When a claim was submitted, the provider certified, among other things, that:

    a. The contents of the claim form were true, accurate, and complete; and

    b. The claim form was prepared in compliance with the laws and regulations governing Medicare.

17. Medicare required the provider to maintain complete and accurate records that documented the services provided to a Medicare beneficiary, identify who rendered the services,

established the medical necessity of those services, and supported payment for those items or services.

## The Defendants and Relevant Individuals

18. Defendant **FARRAH FOROUGH FARIZANI, D.O.** ("**FARIZANI**"), a resident of Houston, Texas, was a physician licensed to practice medicine in the State of Texas. **FARIZANI** was the medical director for Hillcroft Physicians, P.A. ("Hillcroft Physicians"), located at 6400 Hillcroft, Houston, Texas, 77081, which she owned and controlled with her husband, **HAMID REZA RAZAVI**. Hillcroft Physicians was enrolled with TMHP and Medicare as a Family Practice.

19. Defendant **HAMID REZA RAZAVI** ("**RAZAVI**"), a resident of Houston, Texas, was **FARIZANI**'s husband and business partner. Along with **FARIZANI**, **RAZAVI** owned or controlled Hillcroft Physicians. **RAZAVI** also owned Paragon Medical Management, Inc., a purported medical management company, and Swisswell, L.L.C., which owned 6400 Hillcroft, Houston, Texas, where Hillcroft Physicians was located.

20. Defendant **ELIE HANNA HAJJAR** ("**HAJJAR**"), a resident of Houston, Texas, was an employee of Hillcroft Physicians. **HAJJAR** was not a licensed medical professional in the State of Texas.

21. Defendant **JUAN ACUÑA** ("**ACUÑA**"), a resident of Houston, Texas was an employee of Hillcroft Physicians. **ACUÑA** was not a licensed medical professional in the State of Texas.

22. Person 1, an employee of Hillcroft Physicians, was not a licensed medical professional in the State of Texas.

**The Fraudulent Scheme**

*Overview of the Scheme*

23. Defendants **FARRAH FOROUGH FARIZANI**, **D.O.**, **HAMID REZA RAZAVI**, **ELIE HANNA HAJJAR**, and **JUAN ACUÑA**, and their co-conspirators engaged in a scheme and artifice to defraud Medicaid and Medicare by submitting and causing to be submitted false and fraudulent claims for services that were not provided as billed or were not provided by a licensed, qualified, and enrolled provider. The Defendants implemented this scheme by directing and ultimately having unlicensed and non-enrolled individuals, including **HAJJAR** and **ACUÑA**, practice medicine and render medical services to clients and beneficiaries, and then billing Medicaid and Medicare as though **FARIZANI** had provided the services. Over the course of the scheme, which began no later than 2010, and continued through at least 2017, Medicaid and Medicare were billed more than $32 million and paid over $12 million for services purportedly provided by **FARIZANI**, many of which were provided by **HAJJAR** or **ACUÑA**.

*Purpose of the Scheme*

24. It was a purpose of the scheme for defendants **FARRAH FOROUGH FARIZANI**, **D.O.**, **HAMID REZA RAZAVI**, **ELIE HANNA HAJJAR**, and **JUAN ACUÑA**, and their co-conspirators to unlawfully enrich themselves by, among other things: (1) submitting and causing to be submitted false and fraudulent claims to Medicaid and Medicare for services that were not provided as billed or were not provided by a licensed, qualified, and enrolled provider; and (2) diverting the proceeds of the fraud for their personal use and benefit, and the personal use and benefit of their co-conspirators, in the form of compensation, disbursements, and other remuneration.

*Manner and Means of the Scheme*

25. **FARIZANI**, **RAZAVI**, and others, known and unknown to the Grand Jury, marketed Hillcroft Physicians to a patient population consisting primarily of non-English speaking Medicaid clients, many of whom were unfamiliar with the American medical system.

26. **FARIZANI**, **RAZAVI**, and others, known and unknown to the Grand Jury, hired persons who were not licensed medical professionals, including **HAJJAR**, **ACUÑA**, and Person 1, to pose as licensed medical professionals at Hillcroft Physicians.

27. **FARIZANI**, **RAZAVI**, **HAJJAR**, **ACUÑA**, and others, known and unknown to the Grand Jury, led patients and staff to falsely believe that **HAJJAR**, **ACUÑA**, and Person 1 were licensed to practice medicine or were otherwise licensed medical professionals.

28. At **FARIZANI** and **RAZAVI's** direction, **HAJJAR**, **ACUÑA**, and Person 1 posed as licensed medical professionals at Hillcroft Physicians. Without **FARIZANI**'s supervision, **HAJJAR**, **ACUÑA**, and Person 1 engaged in the practice of medicine by examining, diagnosing, treating, referring, and prescribing drugs for clients and beneficiaries.

29. At times, **FARIZANI** traveled outside the country or was otherwise absent from Hillcroft Physicians. During **FARIZANI**'s absences, **FARIZANI** and **RAZAVI** left **HAJJAR** in charge of Hillcroft Physicians. During **FARIZANI**'s absences, **HAJJAR**, **ACUÑA**, Person 1, and other persons who were not licensed medical professionals continued examining, diagnosing, treating, referring, and prescribing drugs for patients.

30. **FARIZANI** provided blank, pre-signed prescriptions to **HAJJAR**, **ACUÑA**, Person 1, and other persons who were not licensed medical professionals, for issuing prescriptions in **FARIZANI**'s absence or without her supervision.

31. At **FARIZANI** and **RAZAVI**'s direction, **HAJJAR**, **ACUÑA**, Person 1, and

others known and unknown to the Grand Jury, despite knowing that **FARIZANI** did not in fact provide the services, falsified entries in patient records to make it appear as though **FARIZANI** had rendered the services. **FARIZANI**, **RAZAVI**, **HAJJAR**, **ACUÑA**, and others known and unknown to the Grand Jury, directed billing staff to submit false claims to Medicaid, Medicare, and other health care benefit programs as though **FARIZANI** had rendered the services.

32.   **FARIZANI**, **RAZAVI**, and others, known and unknown to the Grand Jury, hired non-physician medical professionals to see and treat patients. When these non-physician medical professionals saw and treated patients, **FARIZANI**, **RAZAVI**, and others known and unknown to the Grand Jury, directed billing staff to submit false claims to health care benefit programs as though **FARIZANI** had rendered the services.

33.   From in or around 2010 to in or around 2017, **FARIZANI**, **RAZAVI**, **HAJJAR**, **ACUÑA**, and others, known and unknown to the Grand Jury, submitted or caused the submission of approximately $31.4 million in claims to Medicaid and MCOs for medical services purportedly performed by **FARIZANI**, many of which were performed by **HAJJAR**, **ACUÑA**, Person 1, or others. Medicaid and MCOs paid approximately $12.2 million on those claims.

34.   From in or around 2014 to in or around September 2017, **FARIZANI**, **RAZAVI**, **HAJJAR**, **ACUÑA**, and others, known and unknown to the Grand Jury, submitted or caused the submission of approximately $648,000 in claims to Medicare for medical services purportedly performed by **FARIZANI**, many of which were performed by **HAJJAR**, **ACUÑA**, Person 1, or others. Medicare paid approximately $257,000 on those claims.

35.   **FARIZANI**, **RAZAVI**, and others, known and unknown to the Grand Jury, paid Paragon Medical Management, Inc., purportedly for medical management services.

36.   **FARIZANI**, **RAZAVI**, and others known and unknown to the Grand Jury, paid

Swisswell, L.L.C., purportedly for rent at 6400 Hillcroft.

37. After learning of the investigation into conduct at Hillcroft Physicians, **FARIZANI**, **RAZAVI**, **HAJJAR** and others known and unknown to the Grand Jury, sought to conceal **HAJJAR**'s and **ACUÑA**'s role at Hillcroft Physicians by falsely conveying to law enforcement that **HAJJAR**, **ACUÑA**, and Person 1 acted only as medical assistants.

## COUNT ONE
### Conspiracy to Commit Healthcare Fraud
### (18 U.S.C. § 1349)

38. The allegations in paragraphs 1 through 22 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

39. Beginning in or around late 2009, and continuing through in or around 2018, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas and elsewhere, the defendants,

**FARRAH FOROUGH FARIZANI, D.O.,
HAMID REZA RAZAVI,
ELIE HANNA HAJJAR**, and
**JUAN ACUÑA,**

did knowingly and willfully combine, conspire, confederate, and agree with each other and with others, known and unknown to the Grand Jury, to commit certain offenses against the United States, namely to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), including Medicaid and Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

### Purpose of the Conspiracy

40. The object and purpose of the conspiracy are described in paragraphs 23 through 24 of this Indictment, and are realleged and incorporated by reference as though fully set forth herein.

### Manner and Means of the Conspiracy

41. In furtherance of the conspiracy and to accomplish its object and purpose, the manners and means that were used are described in paragraphs 25 through 37 of this Indictment, and are realleged and incorporated by reference as though fully set forth herein.

All in violation of Title 18, United States Code, Section 1349.

### COUNTS TWO-SIX

### False Statements Relating to Health Care Matters
### (18 U.S.C. §§ 1035 and 2)

42. Paragraphs 1 through 11, and 18 through 37 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

43. On or about the dates set forth below, in the Houston Division of the Southern District of Texas, defendants,

**FARRAH FOROUGH FARIZANI, D.O.,
HAMID REZA RAZAVI, and
ELIE HANNA HAJJAR,**

aiding and abetting and aided and abetted by each other and by others, known and unknown to the Grand Jury, did knowingly and willfully make materially false writings and documents, as set forth below, knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in connection with the delivery of and payment for health care benefits, items, and services, and in a matter involving a health care benefit program, specifically Medicaid and its MCOs:

10

| Count | Date | Patient | Description | Nature of Falsity |
|---|---|---|---|---|
| 2 | 2/23/2016 | A.A. | Medical Record | **FARIZANI** identified as the provider |
| 3 | 3/9/2016 | H.A-R. | Medical Record | **FARIZANI** identified as the provider |
| 4 | 3/8/2016 | E.A-R. | Medical Record | **FARIZANI** identified as the provider |
| 5 | 3/8/2016 | Af.A-R. | Medical Record | **FARIZANI** identified as the provider |
| 6 | 3/8/2016 | Ab.A-R | Medical Record | **FARIZANI** identified as the provider |

In violation of Title 18, United States Code, Sections 1035 and 2.

## NOTICE OF CRIMINAL FORFEITURE
### (18 U.S.C. § 982(a)(7))

Pursuant to Title 18, United States Code, Section 982(a)(7), the United States of America gives notice to defendants **FARRAH FOROUGH FARIZANI**, **D.O.**, **HAMID REZA RAZAVI**, and **ELIE HANNA HAJJAR**, that, upon conviction of Counts One through Six, all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such offenses is subject to forfeiture.

Pursuant to Title 18, United States Code, Section 982(a)(7), the United States of America gives notice to defendant **JUAN ACUÑA**, that, upon conviction of Count One, all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such offenses is subject to forfeiture.

### Money Judgment and Substitute Assets

Defendants **FARRAH FOROUGH FARIZANI**, **D.O.**, **HAMID REZA RAZAVI**, **ELIE HANNA HAJJAR**, and **JUAN ACUÑA** are notified that upon conviction, a money judgment may be imposed against each defendant. In the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of each defendant up to the amount of the money judgment.

A TRUE BILL

*Original Signature on file*
FOREPERSON

RYAN K. PATRICK
UNITED STATES ATTORNEY

DANIEL KAHN
ACTING CHIEF, FRAUD SECTION

*Kathryn Olson*
KATHRYN OLSON
SPECIAL ASSISTANT UNITED STATES ATTORNEY
U.S. ATTORNEY'S OFFICE FOR
THE SOUTHERN DISTRICT OF TEXAS
DEVON HELFMEYER
TRIAL ATTORNEY
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE